[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
Nature of Proceedings CT Page 3621
On 1/18/90, Sherry G., having spent less than two weeks of her 27 months of life in the sole care of her mother, became the subject of this petition filed by her legal guardian, the Department of Children and Youth Services (DCYS) seeking to terminate the parental rights of her mother and, lacking a legal, adjudicated or acknowledged father, her sole legal guardian, so that she might secure a permanent home through adoption. At the initial hearing held within 30 days, as required by subsection (a) of Sec. 45-61d, (incorporated by reference in subsection (b) of Sec. 17-43a of the Conn. Gen. Stats (Rev. 1989) applicable to children previously committed to DCYS as neglected or uncared-for under Sec. 46b-129, subsection (d)) Gloria G. appeared with counsel, denied the three alleged grounds for termination of her parental rights, and was ordered to participate in a psychological evaluation ordered on motion of the petitioner. Trial on the matter was postponed to implement the psychologist's suggestion that the mother's ". . . significant psychological difficulties . . . might be better clarified through psychiatric and full diagnostic examination." (Petitioner's Exh. A., p. 7) After three scheduled appointments with the court appointed psychiatrist had been missed by the mother, no further time was allowed and a trial date set for 7/9/90. Trial concluded on 8/15/90 and the parties given to 9/28/90 for the filing of trial memoranda.
Facts
Evidence admitted in two days of trial, interpreted in the light of the prior record in this court concerning this child, of which judicial notice is taken, supports the finding of the following facts:
Gloria G., the third of nine children born to alcoholic parents, was committed to the state of Connecticut as a neglected child at the age of seven and spent the balance of her minority in foster care. An excellent student, she graduated from high school and in 1977 from Adelphi College in New York. After a serious car accident the year she graduated and a prolonged recovery period, she embarked upon a series of short-term jobs, interrupted by the birth out of wedlock of her two older children in January of 1979 and August of 1980. In 1983 her mother was awarded legal custody of these children in the Probate Court, with Gloria's consent, after what the grandmother asserted to be a period of neglect and abuse. (Id., p. 1-2.)
Although not then caring for these children, Gloria was unemployed and had no home of her own on 10/29/87 when Sherry G. was born. Lilly S., an elderly acquaintance whom Gloria had met six months earlier, took mother and infant into her home after CT Page 3622 Sherry's birth and shared child-care responsibilities for approximately one year until Gloria moved out, leaving the child behind for a number of reasons: She was working; Lilly (although then nearly 70 and a social security recipient) was taking good care of the child; moving a year-old child from the home of a baby-sitter to the mother's home after work in cold weather would be bad for the child. (Testimony of respondent, 8/15/90.) During the next five months, Gloria visited her child sporadically and, while continuing to collect AFDC or working, did not contribute more than token amounts toward the child's care. Gloria testified that she had offered to pay support but, after complaining of her financial difficulties, Lilly had said "Don't bother", and she had not, leaving Lilly to support the child out of her Social Security award. When Lilly had suggested involving DCYS to secure support for the child, Gloria resisted, fearing the loss of Sherry's custody as she had the custody of her two older children. (Id.)
Soon after moving out of Lilly's home, Gloria secured her own apartment which she occupied from November of 1988 until February of 1989 when she was evicted for non-payment of rent. She testified that this was the intended result of withholding rent payments after she decided the neighborhood was bad and she did not wish to remain there. Lilly, concerned that substance abuse would place the child at risk in Gloria's home, referred the matter to DCYS. Gloria did, in fact, remove, without opposition by DCYS, Sherry to her apartment on 2/10/89, but returned her to Lilly just eight days later, expressing her desire for Lilly to continue caring for her indefinitely and her intention to move out of town. Lilly then contacted DCYS again in order to secure the child's placement as well as money for her support. By the time DCYS filed a petition alleging the child to be neglected on 3/30/89, Gloria's whereabouts were unknown, and on 4/20/89 the court found by default that Sherry was neglected by reason of abandonment as well as uncared-for because of homelessness, within the definitions of Sec. 46b-120. On 5/18/89 the child was committed to DCYS which had licensed Lilly as a foster parent so that the child's placement would not be disrupted.
Eight months later, during which the mother failed to visit more than twice, to secure housing, employment or to communicate her whereabouts to either DCYS or the foster mother, DCYS initiated this petition, alleging grounds (1), (2) and (4) for terminating her parental rights under subsection (b) of Sec. 17-43a. At the time of filing, Gloria's whereabouts being unknown, service by publication was ordered and confirmed. (Sec. 45-61d, subsection (c).) Subsequent to the order for publication, information was given that suggested that Gloria might be found at the home of her mother, or of a friend on CT Page 3623 Garden Street. Notices were sent to all of these addresses, and as a result, Gloria did appear at the initial hearing on this petition on 2/8/90 at which time she provided a third address where she could be reached.
At the time of this initial hearing, Gloria's last meeting with her daughter had been two months earlier when Lilly had invited her to Thanksgiving dinner. After an altercation during which Gloria had called Lilly's granddaughter a "bitch", Lilly told her to leave and that any further visits would have to be arranged by DCYS at the agency office. According to Lilly, only one such visit was scheduled, but when Lilly had taken the child to the DCYS office, Gloria failed to appear.
From the time of commitment (5/18/89) to the adjudicatory date of this petition (1/18/90), Gloria had only seen her daughter twice: Once a week after commitment, and again on Thanksgiving of 1989. Three other prearranged visits had aborted: In June of 1989 the social worker cancelled a visit; Gloria cancelled another in July; and the third was when the child was brought to the office and the mother failed to appear. At no time during this period was DCYS given any address or telephone number at which Gloria could be reached, either at her home of the moment or at her various places of employment. Messages were left for her with Lilly, but on the only occasion that she phoned in response to such message, in January of 1990, she found the social worker out and left no telephone number or mailing address where she could be called back.
Subsequent to the filing of this petition, however, Gloria telephoned DCYS 13 times, but only three visits were arranged: Two in May of 1990 and one again on 8/1/90. The problem was never the refusal of DCYS to permit a visit but rather the difficulty of contacting her: One address Gloria gave as a mailing address only, but she stopped there to get her mail at irregular intervals; on one occasion she left a telephone number but when the social worker called her back, it turned out to be the home of the maternal grandmother who did not know when she would next see Gloria; when the social worker, anticipating these problems, gave Gloria a specific date and time to call back to confirm a proposed visit, Gloria did not call.
Gloria consistently told DCYS that she intended, one day, to resume care of Sherry. She never indicated, however, a present ability to do so, intending first to "straighten out" her own life with regard to employment, education and housing. (Testimony of Meldum, 8/15/90.) In her own testimony on 8/15/90, however, Gloria claimed that she was presently able to care for Sherry, having secured housing, sufficient income and child care arrangements. No testimony was offered to support CT Page 3624 any of these arrangements, however, nor did she explain why this present ability to care for the child had not been communicated to DCYS or to Lilly prior to the final date of trial. Further, none of the places of employment or the residence asserted by Gloria could be confirmed, although she repeatedly gave job interviews or working assignments as the reason for failing to attend appointments with the psychiatrist or other visits with Sherry that had been scheduled in May of 1990.
Gloria did not deny having a substance abuse problem, but did not feel she needed treatment. In her testimony she voiced a willingness to engage in treatment if required to do so, but was equivocal in her willingness to be seen by a psychiatrist. First she said it was unnecessary since she had already seen a psychiatrist at Blue Hills Hospital; then she said it would be "frightening"; then she said it was too expensive. She claimed her eviction from the only apartment she had had since Sherry's birth had been deliberate ("I let myself yet evicted"). Since then she had lived with various friends including one living in housing for the elderly, and was currently in an apartment belonging to an elderly victim of Alzheimer's disease who was being cared for by Gloria's friend. Asked why she failed to keep DCYS informed of her various moves Gloria answered, "It didn't seem important to let DCYS know my address" and claimed that the social worker knew how to contact her by mail. Admitting there were periods when she had not been working during which she had no other source of income, she added, "I just had people help me out." While she further admitted that her drinking had gotten a "little out of hand" and that the "party never seemed to end", she denied needing treatment. Asked why, in that event, she had entered the alcohol treatment program at Blue Hills Hospital on three occasions (1984, 1986, 1987), she gave a variety of reasons: Because her mother told her she must do so to "get my kids back"; for a place to stay when pregnant with Sherry. Asked why she had cancelled two appointments with the psychiatrist and failed to keep a third, she responded, "I don't remember."
To the court appointed psychologist, Dr. D.M. Mantell, with whom Gloria did keep a scheduled appointment, she admitted a history of drinking, having last been drunk a few weeks before their 3/15/90 interview, but she denied it was a problem for her ". . . because she doesn't have any responsibilities." (Petitioner's Exh. A., p. 5.) Dr. Mantell found her status to be "clinically compromised, perhaps as a result of chronic substance abuse, and perhaps also by other problems . . . she was not able to pass a mental status exam . . . and presents in a manner that suggests that there may now be an organic element." (Id., p. 6.) He concluded that "she has a very substantial substance abuse problem that is continuing." (Id., CT Page 3625 p. 7.) On 8/15/90 Dr. Mantell testified that her attitude toward her drinking was an obstacle to reuniting her with her children. He found the prognosis for any change to be poor, based upon chronic and longstanding difficulties that have interfered with her relationships with all three of her children and her present disavowal of all responsibility. He saw no reasonable probability that she could be rehabilitated sufficiently to meet Sherry's needs within a period of time Sherry could wait, nor had Gloria voiced to him any tangible plan to do so. He found the foster mother to be the child's psychological parent at present, and recommended continued placement with her as serving the child's best interests. Adjudication — on 1/18/90, the date of filing
The petitioner has met its burden of providing clear and convincing proof of all three alleged grounds for terminating Gloria's parental rights:
1) Abandonment — In Sherry's 27 months of life, as of the date this petition was filed, Gloria had only been her primary caretaker for less than two weeks (in February of 1989). At the age of one year, Sherry had been left in the sole care of Lilly S. for reasons that were neither compelling nor convincing. During the 15 months that preceded the filing of this petition, Gloria failed to support the child, did not keep the child's caretakers informed of her whereabouts, and visited sporadically — only twice in eight months between the date of commitment to DCYS and the date this petition was filed. This is clear and convincing proof that for far longer than just one year, Gloria has "failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child" within the meaning of Sec. 17-43a, subsection (b)(1). 2) Failure to rehabilitate — When Sherry was committed to DCYS in May of 1989, Gloria had no home, no stable source of income and had neither been visiting the child regularly nor contributing to her support. Moving frequently, she failed to keep the child's caretaker informed of her changing whereabouts. She had a substance abuse problem for which she had been hospitalized three times in three years, but for which she was receiving no treatment. In the eight months since commitment, none of these facts has changed: She had visited Sherry only twice. She failed to inform DCYS of her constantly changing whereabouts. Despite her excellent education, she had failed to secure stable employment. She continued to drink to the point of having been drunk two weeks before her psychological examination, long after the initiation of this proceeding, but continued to assert that drinking was no problem for her since she had "no responsibilities" and therefore to deny any need for treatment. Since these circumstances had existed for at least seven months prior to commitment, and continued for the CT Page 3626 six months that this proceeding was pending prior to trial, a waiver of the 12 months required is clearly indicated. See In Re Saba P., 13 Conn. Appl. 605 (1988). No expectations were spelled out for the mother at the time of commitment since she had failed to appear at all hearings scheduled on the original neglect petition in 1989. The lack of such expectations is not fatal to the establishment of this statutory ground for terminating parental rights, however. They are spelled out in those cases there a parent is present in court at the time of commitment and is entitled to be informed of the elements that will be considered at subsequent hearings for either revocation of commitment or termination of parental rights. Where a parent has never appeared in court prior to the filing of a termination petition, all the court is required to do is to compare the parent's circumstances at the time of commitment with those existing on the date the termination petition was filed or last amended, and determine if there has been sufficient change in those circumstances to support a reasonable expectation that the parent is presently, or will soon be, able to resume responsibility for the child. The evidence here is uncontroverted that there has been no such change in Gloria's circumstances: Her life is as aimless, rootless, and irresponsible as it was in May of 1989, or indeed as it was in November of 1988 when she stopped living in the same home as her daughter. She remains without housing of her own, without predictable source of income, evidencing little interest in her daughter or in addressing her substance abuse problem. No aspect of her life suggests that any change in this pattern is likely to occur in any foreseeable future. Whether the cause of this condition in the life of a woman who showed so much potential as a youth is of organic, psychiatric or substance abuse origin is immaterial to its impact on the child, or to the conclusion that Gloria, as the parent of a child who was previously found to be neglected and uncared for, has
 failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, . . . [she] could assume a responsible position in the life of the child.
3) No ongoing parent-child relationship — While Dr. Mantell observed an appropriate interaction between mother and child on 3/15/90, after 18 months of living in the sole care of Lilly S. with only sporadic contacts with her mother (the last being four months earlier) it is not surprising that he found Lilly to be the child's psychological parent. Even a lay trier of fact could conclude that a biological parent who had had such fleeting contact with a three year old for half her lifetime CT Page 3627 could not have the kind of relationship
 . . .that ordinarily develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child
within the meaning of Sec. 17-43a, subsection (b)(4). That fact alone, however, is not grounds to terminate the parent's rights. The court must also find, by clear and convincing proof, that
 . . . to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child.
The record in this case compels such a conclusion. After three years of being cared for by Lilly S., during the second half of which her mother was living elsewhere and maintaining only fleeting contact, Sherry needs to be assured of a permanent home. Nothing in Gloria's situation at the time of filing this petition suggests that she will be able to provide such a permanent home, or, indeed, except for a few statements to Lilly and on the record in this case, that she is even motivated to do so. Whether DCYS approves adoption by Lilly S. or by a member of Lilly's family well-known to the child, adoption is clearly preferable to waiting longer than the lifetime she has already waited for a permanent home.
Disposition — as of 8/15/90, the final date of trial.
In the seven months between the date of filing this petition and the last trial date, no change has been made in Gloria's situation. While she testified she was then ready to resume full care of Sherry, no evidence was offered in support of this contention. She was staying with a friend in the apartment of the friend's ailing aunt, with only the expectation that another apartment in the same building would be made available in the undefined future. She had visited the child only three times — twice in May and again on August 1 — with a number of scheduled vis its cancel led by the mother because of employment commitments, none of which were substantiated. She continued to drink to excess, by her own admission, and to deny the need for treatment. There is a remarkable consistency to Gloria's lifestyle which existed when she was pregnant for Sherry and stayed with casual friends or admitted herself to Blue Hills Hospital in lieu of obtaining housing for herself and an infant. Whether this pattern is due to the car accident thirteen years ago or to substance abuse or to purely CT Page 3628 psychological factors is irrelevant in its impact on this child.
Before a court may terminate a parent's rights, however, it must consider the six factors is set forth in subsection (d) of Sec. 17-43a:
(1) No services could be provided to Gloria to facilitate reunion with her child other than to permit visitation when requested. Gloria was fully aware of treatment facilities for substance abuse problems, but denied any need to avail herself of them. She was never refused a requested visit with her child; only the inability to reach her by mail or phone impeded implementation of the infrequent requests that were made.
(2) Gloria did not come to court in 1989 for the court to be able to spell out expectations for reunification. No service agreements were ever negotiated with DCYS because of Gloria's elusiveness. The only court orders imposed were for attendance at court and for clinical evaluations in connection with the instant proceeding. Gloria attended all court hearings and the evaluation by Dr. Mantell but failed to keep three scheduled appointments with Dr. Bordan, the psychiatrist.
(3) Dr. Mantell's finding that the child regarded Lilly S., her lifetime caretaker, as her psychological parent, was unrefuted. While she appeared to recognize and interact appropriately with Gloria, there was no question that her "significant emotional ties" are with Lilly S.
(4) At the age of three and one-half, Sherry is about to begin her journey into the world beyond home. Soon she will enter nursery school and then kindergarten. She needs to have the issue of where her home is, and who her mother is, settled without waiting longer than the lifetime she has already waited before entering that wider world.
(5) Gloria has made no apparent effort to adjust her circumstances, conduct or conditions to make it in Sherry's best interests to return to her home — if, indeed, she has a home — within the foreseeable future. Gloria's contacts with the child's foster mother and legal guardian have been infrequent and unpredictable for over a year, and there is no indication from any of the presently prevailing circumstances that this is likely to change.
(6) The only restriction placed on Gloria's visiting was when Lilly stopped visits at the foster home following a verbal assault on a member of her family. Gloria was offered visitation at the DCYS office upon request but the only times CT Page 3629 she requested such visits were in connection with court hearings. The restriction was not unreasonable considering the circumstances under which it was imposed, and it was never given by Gloria as a reason for her failure to see her child on a regular basis.
Having considered the foregoing, and being aware that if Lilly herself is not able to adopt the child, her granddaughter, well-known to Sherry, is ready and willing to do so, it is found to be clearly and convincingly in the best interests of Sherry G. for her mother's parental rights to be terminated so that she may at last know the security of a permanent home.
It is therefore ORDERED that the parental rights of .Gloria G., mother and sole legal guardian of the child Sherry G., be and hereby are terminated. And it is further ORDERED that the Commissioner of DCYS be appointed statutory parent for the purpose of placing the child forthwith in adoption and that such Commissioner shall submit to this court no later than 90 days from the date of this judgment a written report as to the progress toward such adoption, and thereafter in such form and at such intervals as may be from time to time ordered by this court. And it is further ORDERED that, in the event adoption has not then been finalized, such Commissioner shall file a Motion to Review Plan for Terminated Child, to be in full compliance with federal law, no later than 3/1/92.
Appeal
Gloria G. has 20 days from the date of this judgment in which to seek an appeal. If, after being informed by her trial counsel of the court's judgment and her right to take an appeal, she affirmatively manifests her desire to do so, if her trial counsel is willing to act in that capacity, the court will appoint her for this purpose. If the respondent manifests her desire to take an appeal and if her trial counsel declines to represent her because in her professional opinion it lacks merit, she is not required to do so but may file a timely motion to withdraw and to extend time in which to take an appeal. The court will then appoint another attorney to review this record who will, if willing to represent the mother on appeal, be appointed for this purpose. If the second attorney determines that there is no merit to an appeal, he or she is requested to make this known to the court at the earliest possible moment, and the respondent mother will be informed by the clerk forthwith that she has the balance of the extended time to appeal in which to secure her own counsel who, if qualified, may be appointed to represent her on the appeal. If she does not do so, then upon expiration of the extended appeal period, her right to pursue an appeal will be ended and the termination of CT Page 3630 her parental rights final. The child will at that time, and not before, be free to be placed in adoption.
If such procedures satisfy the sixth amendment right to counsel in criminal cases (Douglas v. California, 372 U.S. 353
(1963); Fredericks v. Reincke, 152 Conn. 501 (1965), they are even more appropriate where there are interests of a third party involved: Those of the child whose need for permanent safe parenting is entitled to at least as great a degree of consideration as are those of the parent whose right to raise her is at issue. Even unsuccessful appeals delay permanent planning for years since no child may be adopted until the appellate process is exhausted. The need for finality of judgment in cases where the state initiates legal action against indigent respondents, which gave rise to the rule of Douglas and Fredericks, supra, applies as much or more to cases where the person affected by the judgment is a young child for whom the passage of periods of time that may seem short for adults can work changes with lifetime implications.
Entered at Hartford, Connecticut this 8th day of November, 1990.
Brennaman, J.